**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BEST CHOICE ROOFING & HOME IMPROVEMENT, INC.,** | ) ) ) | |
| **Plaintiff/Counter-Defendant,** | ) ) | |
| **v.** | ) ) | **NO. 3:18-cv-00615** |
| | ) ) | **JUDGE CAMPBELL** |
| **BEST CHOICE ROOFING SAVANNAH, LLC & BEST CHOICE ROOFING AUGUSTA, LLC,** | ) ) ) ) | **MAGISTRATE JUDGE NEWBERN** |
| **Defendants/Counter-Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **HENRY WAYNE HOLLOWAY, III,** | ) ) | |
| **Third-Party Defendant.** | ) | |

**MEMORANDUM**

**I.  Introduction**

Pending before the Court are Plaintiff/Counter-Defendant's Motion to Dismiss Counter-Complaint (Doc. No. 28); Defendants' and Counter-Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 52); and Counter-Defendants' Motion for Summary Judgment (Doc. No. 56). For the reasons set forth herein, Defendants' and Counter-Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 52) is **DENIED**; and Counter-Defendants' Motion for Summary Judgment (Doc. No. 56) is **GRANTED**, in part, and **DENIED**, in part. Defendants' counterclaim for breach of contract for failure to comply with the notice and cure provision may proceed to trial. All other counterclaims are dismissed. Plaintiff/Counter-Defendant's Motion to Dismiss Counter-Complaint (Doc. No. 28) is **DENIED,** as moot.

## II. Factual and Procedural Background

Plaintiff Best Choice Roofing & Home Improvement, Inc. ("BCR") brought this action against Defendants Best Choice Roofing Augusta, LLC and Best Choice Roofing Savannah, LLC ("Defendants") to recover for breach of a "License Agreement" executed by each of the defendants, and alternatively, to recover for trademark infringement and unfair competition. (Doc. No. 1). Through an Amended Complaint, Plaintiff BCR added claims for false designation of origin/false advertising, trademark dilution, and unjust enrichment. (Doc. No. 12). Plaintiff alleges Defendants executed, and subsequently breached, License Agreements for use of the "Best Choice Roofing" trademarks for their roofing services. Best Choice Roofing Savannah, LLC executed a License Agreement on November 12, 2015, and Best Choice Roofing Augusta, LLC executed a License Agreement on June 9, 2017. (Doc. No. 30-2). Plaintiff alleges Defendants breached the Agreements by failing to submit monthly royalty payments, or alternatively, that their use of the trademarks is unlawful. (*Id.*)

In response, Defendants filed an Answer and Counter-Complaint (Doc. No. 15), in which they raised the following counterclaims against Plaintiff BCR and third-party defendant Henry Wayne Holloway, III:[1] corporate veil, fraudulent misrepresentation, fraudulent concealment, constructive fraud, fraud in the inducement to contract, breaches of contract, violations of Tennessee Consumer Protection Act ("TCPA"), tortious interference with business relationships (customers), defamation, and unjust enrichment.

According to the parties' statements of undisputed facts, BCR has six or seven corporate branches in multiple states, each of which is owned by Mr. Holloway as BCR's sole shareholder. (Doc. No. 62 ¶¶ 1, 4). The corporate branches do not operate under license agreements. (*Id.*)

---

[1] For ease of reference, these parties will be referred hereinafter as "Plaintiffs."

The defendant companies are owned, in whole or in part, by Juanita "Tinker" Covington. (*Id.* ¶ 2). Ms. Covington began working for Mr. Holloway in November of 2012. (*Id.* ¶ 3). Ms. Covington was a sales representative for about four months, then transitioned into the role of sales manager. (*Id.*) In 2015, at Mr. Holloway's request, Ms. Covington opened a new location for BCR in Savannah, Georgia and served as general manager. (*Id.*)

On November 12, 2015, Ms. Covington and Mr. Holloway entered into a "License Agreement" for the Savannah location. (*Id.*) Ms. Covington testified in her deposition she did not seek the assistance of counsel before executing the agreement because she "completely trusted Mr. Holloway with everything, as far as all the paperwork, everything that was being done." (Doc. No. 42-1, at PageID # 493). Ms. Covington conceded she was not prevented from seeking counsel before executing the agreement, but she just "didn't feel the need at the time." (*Id.,* at 493, 498).

On June 9, 2017, Ms. Covington and Mr. Holloway entered into a "License Agreement" for the Augusta location. (Doc. No. 62 ¶ 7). Ms. Covington did not consult legal counsel before entering the second agreement. (Doc. No. 42-1, at PageID #500). The terms of the License Agreements are substantially similar. (*Id.*)

Through the pending motions, Plaintiffs seek summary judgment on all counterclaims, and Defendants seeks summary judgment on their counterclaims for fraudulent misrepresentation and for violation of the TCPA.

## III.  Analysis

### A.  The Standards Governing Motions for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio*, 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B. Breach of Contract

Under Tennessee law,[2] the essential elements of a breach of contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract. *C&W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007); *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. Partnership*, 79 F.3d 496, 513 (6th Cir. 1996).

Through the counterclaim, Defendants allege Plaintiffs breached the "License

---

[2]   The parties agree that Tennessee law applies to the claims raised in the pending motions.

Agreements" by failing to comply with the "notice and cure" provision in Section 15.1; by failing to allege specific violations before termination as required by Section 15.2; by "exerting too much control" over their business, transforming their relationship into that of a franchisor/franchisee; and by failing to provide "'marketing ideas' in full" in connection with a "Shark Tank" competition, and refused to deliver on the promised reward, as required by Section 4.2. (Doc. No. 15, at 16-17). Defendants further allege Plaintiffs breached an Asset Purchase Agreement by instituting the current litigation before complying with the provisions of Section 13.11. (*Id.,* at 17).

Plaintiffs argue summary judgment is appropriate on the breach of contract claim because Defendants have not presented evidence of nonperformance of the cited provisions, nor have they shown a causal connection between any alleged breach and damages.

Despite the various allegations made in their counterclaim, Defendants discuss only two of the allegations in responding to Plaintiffs' summary judgment motion: failure to comply with the notice and cure provision in Section 15.1; and exertion of "too much control" over their business. (Doc. No. 63, at 13-15). As Defendants have failed to offer any support for their other breach of contract allegations, summary judgment is warranted on those claims. *Celotex Corp.,* 475 U.S. at 324; *Anderson,* 477 U.S. at 251-52.

Defendants argue Plaintiffs breached the provisions of Section 15.1 of the License Agreements by failing to provide them with notice and an opportunity to cure any breach before terminating the contracts and filing suit. Section 15.1 provides:

15.1  Default by Licensee. If Licensee does not comply promptly with any term or condition of this Agreement at or with respect to any Licensed Location, Licensee will be in default under this Agreement. In addition to all other remedies BCR may have at law or in equity, BCR may (at its option but subject to the notice and cure provisions described below and the terms of this Agreement): (a) terminate the applicable Schedule and the Licensee's right to operate the specified Licensed Concept at the specified Licensed Location, if the default under the Schedule is material, or (b) terminate this Agreement as a whole if Licensee's

default is material and relates to two (2) or more of the Schedules issued to Licensee pursuant to this Agreement.

BCR may not terminate any Schedule or this Agreement as a whole unless BCR gives Licensee prior written notice of and (except as provided below) an opportunity to cure the default. Licensee will have 7 days after the effective date of notice from BCR to cure any default in payment to BCR or its affiliates and 30 days to cure any other type of default, except that Licensee will have no opportunity to cure the default if BCR had given Licensee notice of other defaults (even though cured) under any Schedule(s) issued pursuant to this Agreement. Notwithstanding these notice provisions, if applicable law requires a longer cure period, Licensee will have the longer cure period required by law.

(Doc. No. 30-2, at 12, 36-37).

Plaintiffs argue they were not required to provide notice and an opportunity to cure because the termination was based on Section 15.2 of the License Agreements, which provides:

15.2    Termination. Notwithstanding Section 15.1, BCR may, at its option, terminate this Agreement as a whole on written notice to Licensee (without right to cure), if any of the following events occur:

an assignment of any interest in this Agreement or in any Schedule that is not in accordance with the provisions of Section 12.1;

any transfer of interest in Licensee that is not in accordance with the provisions of Section 12.2;

Licensee discloses the contents of the Code of Conduct or any other of BCR trade secrets or proprietary or confidential information;

Licensee knowingly maintains false books or records, or knowingly submits false reports to BCR, or knowingly misrepresents any material fact in its application for this license; or

Licensee conducts its business hereunder in such a way as to constitute an imminent danger to the public health or poses a risk of significant and immediate damage to the value of the Marks.

(Doc. No. 30-2, at 12, 37). Plaintiffs further cite to a letter, dated July 6, 2018, from Plaintiffs' counsel to Noel R. Bagwell (identified as counsel for Defendants), which states, in pertinent part, as follows:

6

As you know, we represent Best Choice Roofing & Home Improvement, Inc. (hereinafter 'BCR'). As you also know your clients, Best Choice Roofing Savannah, LLC and Best Choice Roofing Augusta, LLC (hereinafter collectively 'LICENSEE') each entered into a License Agreement with BCR to use the BEST CHOICE ROOFING mark in connection with their roofing businesses.

Despite being given many opportunities to do so, LICENSEE has repeatedly failed to submit monthly royalty payments to BCR as required by the License Agreements. *Since LICENSEE's failure to pay for the right to use the BEST CHOICE ROOFING mark poses a risk of significant and immediate damage to the value of the BEST CHOICE ROOFING mark, BCR hereby terminates the License Agreements pursuant to Section 15.2 thereof.*

Please remind LICENSEE that in view of the termination of the License Agreements, use of the BEST CHOICE ROOFING mark must immediately cease. Please also remind LICENSEE that LICENSEE's continued use of the BEST CHOICE ROOFING mark without BCR's permission, authorization or consent is likely to cause consumer confusion.

In view of the foregoing as well as your letter of July 2, 2018, BCR has authorized us to file suit against LICENSEE, which we have done . . .

(Doc. No. 30-3) (emphasis added).

As set out in the letter, Plaintiffs contend the notice and cure provisions of Section 15.1 did not apply because they exercised their right to immediate termination under Section 15.2. The basis given in the letter for immediate termination was the "risk of significant and immediate damage to the value" of the marks posed by Defendants' failure to pay royalties. Although not cited specifically, Plaintiffs' letter presumably invokes the last clause listed in Section 15.2: "Licensee conducts its business hereunder in such a way as to constitute an imminent danger to the public health or poses a risk of significant and immediate damage to the value of the Marks."

The issue raised by the termination letter, in the Court's view, is whether failure to pay royalties constitutes "an imminent danger to the public health" or a "risk of significant and immediate damage to the value of the Marks." Neither party has sufficiently addressed this issue in the briefs. Therefore, the Court declines to resolve the issue through the pending motions.

As for Plaintiffs' alternative argument that Defendants have not shown damages as a result of the alleged breach, Defendants argue their litigation costs were incurred because Plaintiffs failed to provide a notice-and-cure period. Plaintiffs have not cited any authority indicating litigation costs are not recoverable. Thus, Plaintiffs are not entitled to summary judgment on this issue, and Defendants' counterclaim for breach of Section 15.1's notice and cure provisions may proceed to trial.

On the other hand, Defendants' allegation that Plaintiffs exerted "too much control" over Defendants' business, transforming their relationship into that of a franchisor/franchisee, does not state a breach of contract claim. Through Section 18.1 of the License Agreements, Plaintiffs took the position the relationship between the parties was that of licensor/licensee, and not franchisor/franchisee.[3] Plaintiffs did not take a contrary position during the period the agreements were in effect and they do not take a contrary position in this litigation. That Defendants disagree with the label Plaintiffs placed on their relationship through the agreements does not constitute a *breach* of the Agreements.[4] Defendants do not otherwise cite a provision of the agreements breached by an exercise of "too much control." Thus, Defendants' counterclaim for breach of contract based on the exercise of "too much control" cannot withstand summary judgment.

---

[3]  Section 18.1 states as follows:

> Relation of Parties. BCR and Licensee are not and may not be considered as franchisor/franchisee, joint venture, partners, or agents of each other. Neither Licensee nor BCR has the power to bind or obligate the other except as set forth in this Agreement. Licensee specifically acknowledges that the relationship created by this Agreement is not a fiduciary or any other similar or special relationship, but solely an arm's-length business relationship.

(Doc. No. 30-2, at 14).

[4]  Defendants' argument that the exercise of "too much control" triggers application of particular statutes will be considered below.

## C. __Veil-Piercing Claim__[5]

Under Tennessee law, a corporation is presumptively treated as a distinct entity from its shareholders, and a shareholder is not personally liable for the acts of the corporation. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 214 (Tenn. 2012). Under certain circumstances, however, the corporate veil may be pierced and a shareholder held accountable for the obligations of the corporation. *Id.; Church Joint Venture, L.P. v. Blasingame,* 947 F.3d 925, 930 (6th Cir. 2020). The corporate veil is disregarded, for instance, where it has been used "as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." *Rogers,* 367 S.W.3d at 214-15. The veil may also be pierced upon a showing that the corporation is a "sham or a dummy or where necessary to accomplish justice." *Church,* 947 F.3d at 931 (quoting *Schlater v. Haynie,* 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991). The party seeking to pierce the corporate veil has the burden of presenting facts demonstrating it is entitled to relief. *Id.; Rogers,* 367 S.W.3d at 215.

The Tennessee courts consider several factors in determining whether the corporate veil should be pierced:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation

---

[5]   The parties have not addressed the issue of whether "veil piercing" may be asserted as a stand-alone claim before the determination of whether Plaintiffs owes damages to Defendants on any counterclaim. Given the Court's dismissal of the counterclaim on other grounds, however, it is unnecessary to address this issue.

to transfer to it the existing liability of another person or entity; and (11) the failure
to maintain arms-length relationships among related entities.

*Id.,* at 215 (quoting *CAO Holdings, Inc. v. Trost,* 333 S.W.3d 73, 88 (Tenn. 2010)); *see also F&M Mktg. Srvcs., Inc. v. Christenberry Trucking and Farm, Inc.,* 523 S.W.3d 663, 667 (Tenn. Ct. App. 2017).  No single factor is conclusive; courts will typically rely on a combination of the factors in deciding the issue. *Id.* In every case, however, "the equities must 'substantially favor' the party requesting relief," and "the presumption of the corporation's separate identity should be set aside only 'with great caution and not precipitately.'" *Id.* (quoting *Schlater,* 833 S.W.2d at 925).

With regard to the third factor, Tennessee courts have explained that ownership of a corporation by one individual is not uncommon, and "this fact standing alone does not weigh heavily" on the question of whether the corporate veil should be pierced. *F&M Mktg. Srvcs., Inc.*, 523 S.W.3d at 669.  In addition, "the fact that a shareholder exercises complete dominion and control over a corporation alone is insufficient to justify piercing the corporate veil." *Id.* The party seeking to pierce the corporate veil must show that such control was used "to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights." *Id.*

Plaintiffs argue they are entitled to summary judgment on this counterclaim because Defendants have failed to provide sufficient evidence to support it. The only evidence Defendants rely on to support the claim is the deposition testimony of Ms. Covington that an individual named Skye Gardner told her Mr. Holloway had purchased some items for himself through the business accounts of BCR. (Doc. No. 59-1, at 5-6). Defendants have not cited to any deposition or sworn statement of Mr. Gardner. Rather, they cite a document that purports to be an "interview" with Mr. Gardner by Noel Bagwell. (Doc. No. 64-2). Plaintiffs object to consideration of the transcript as inadmissible hearsay.

Rule 56(c)(2) provides that a party may, in connection with a motion for summary judgment, object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." When such an objection is made, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note. *See also Mangum v. Repp*, 674 Fed. Appx. 531, 536-37 (6th Cir. 2017); *Thomas v. Haslam*, 2018 WL 1702064, at *25-26 (M.D. Tenn. March 26, 2018); *Weldon v. Hale,* 2017 WL 3479622, at *7-8 (S.D. Ohio Aug. 14, 2017).[6] Defendants have failed to demonstrate the interview transcript meets the standard for authenticity under the Federal Rules of Evidence. For example, Defendants have not submitted an affidavit from Mr. Bagwell as the person who presumably recorded the interview, nor have they submitted an affidavit from the person who created the transcript. *See, e.g., Mimbs v. Spalding Cty. Sch. Dist.*, 2018 WL 7348863, at *3 (N.D. Ga. Dec. 21, 2018) (holding that unauthenticated transcripts may not be considered in ruling on motion for summary judgment); *Southall v. USF Holland, Inc.*, 2018 WL 6413651, at *10 (M.D. Tenn. Dec. 5, 2018), *aff'd sub nom. Southall v. USF Holland, Inc*, 2019 WL 6605754 (6th Cir. Dec. 5, 2019). Defendants have also failed to explain the admissible form in which the evidence would be presented at trial. Thus, the Court must disregard the interview transcript in considering whether summary judgment is appropriate on the veil-piercing claim.

Defendants alternatively argue Ms. Covington's identification of Mr. Gardner as a possible

---

[6] Although summary judgment should be based on admissible evidence, the evidence does not necessarily have to be presented in final, admissible form at the motion for summary judgment stage. *See, e.g.*, *Thomas,* 2018 WL 1702064, at *25-26.

witness is sufficient to withstand summary judgment on this claim.[7] Naming a witness who could possibly support a claim, however, would not be sufficient to sustain the veil-piercing claim at trial, and is not sufficient to defeat summary judgment. As discussed above, the nonmoving party "must provide evidence" to support its claim, and that evidence must "present a sufficient disagreement to require submission to a jury." *Celotex Corp.,* 475 U.S. at 324; *Anderson,* 477 U.S. at 251-52.[8] Defendants have failed to provide such evidence. Therefore, Plaintiffs are entitled to summary judgment on the veil-piercing claim.

## D.  <u>Tennessee Consumer Protection Act</u>

The Tennessee Consumer Protection Act prohibits the use of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). The Act lists certain acts considered to be "unfair or deceptive," including the following provisions cited by Defendants in their counterclaim:

(5) Representing that goods or services have sponsorship, approval, characteristics,

---

[7]   Defendants do not argue Ms. Covington's testimony about the substance of Mr. Gardner's statement would be admissible at trial, and consequently, have not addressed the hearsay nature of the statement.

[8]   To the extent Defendants argue the naming of witnesses by the non-movant somehow "shifts the burden" on summary judgment to the movant, they are in error. As the Supreme Court explained in *Celotex:*

> . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. . .

> * * *

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule,' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'

477 U.S. at 323-24 (footnote omitted) (emphasis in original).

ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

(8) Disparaging the goods, services or business of another by false or misleading representations of fact;

(9) Advertising goods or services with intent not to sell them as advertised;

(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;

Tenn. Code Ann. § 47-18-104(b)(5), (8), (9), (12).

A "deceptive" act or practice is "'one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact.'" *Audio Visual Artistry v. Tanzer,* 403 S.W.3d 789, 810 (Tenn. Ct. App. 2012) (quoting *Tucker v. Sierra Builders,* 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005)). An act or practice may be deemed "unfair" if it "'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *Tanzer,* 403 S.W.3d at 810 (quoting *Tucker,* 180 S.W.3d at 116-17)).

Section 109(a)(1) of the TCPA provides that "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages." In order to recover under the Act, a plaintiff must prove: (1) the defendant engaged in an unfair or deceptive act; and (2) the defendant's conduct caused an ascertainable loss of money or property. *Tanzer,* 403 S.W.3d at 810. As to the second element, "the alleged 'unfair or deceptive act or practice' must in fact cause the damages of which plaintiff complains." *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006).

Defendants' counterclaim alleges the following violations of the TCPA:

63. Counter-Defendants represented that Counter-Plaintiffs had purchased from Counter-Defendants all of Counter-Defendants' assets related to or used in connection with the businesses Counter-Plaintiffs purchased from Counter-Defendants, whereafter Counter-Defendants' subsequently illegally engaged in a scheme to license to Counter-Plaintiffs intellectual property, which, apparently, was transferred in the aforementioned purchase and sale, to Counter-Plaintiffs (T.C.A. § 47-18-104(b)(5));

64. Counter-Defendants represented that Counter-Plaintiffs had obtained a license to use Counter-Defendants' Trademark, when, in fact, Section 2.1 of the 'License Agreement' restricts the 'scope of the license' 'only to the Licensed Concept specified in an applicable Schedule at the Licensed Location specified in the same Schedule,' which does not include the Trademark, subsequently adding, 'This license does not extend to any other location, product, concept, or distribution channel' (T.C.A. § 47-18-104(b)(5));

65. In Section 18.1 of the 'License Agreement,' Counter-Defendants represented that the relationship between Counter-Defendants and Counter-Plaintiffs was not, and could not be construed to be, a franchisor/franchisee relationship, when, in fact, the relationship between Counter-Defendants and Counter-Plaintiffs was a franchisor-franchisee relationship, as defined by the FTC Franchise Rule. (T.C.A. § 47-18-104(b)(5));

66. Counter-Defendants deceptively, misleadingly, and wrongfully published statements to customers, who had a contingent agreement for services with Counter-Plaintiffs, that Counter-Plaintiffs were a fraudulent business, and a scheme that was just trying to take customers' money (T.C.A. § 47-18-104(b)(8));

67. In the Asset Purchase Agreement between Counter-Defendants and Counter-Plaintiff, Counter-Defendants advertised certain intellectual property, business opportunities, and other services with intent not to sell them as advertised, when Counter-Defendants offered for sale a business in Georgia, along with all of Counter-Defendants' assets related to or used in connection with the businesses with the intent to engage in a conflicting transaction that would also allow Counter-Defendants to license to Counter-Plaintiffs the very intellectual property it was apparently selling, transferring, and assigning to Counter-Plaintiffs, that is all of Counter-Defendants' intellectual property related to or used in connection with the businesses (T.C.A. § 47-18-104(b)(9));

68. In the License Agreement between Counter-Defendants and Counter-Plaintiff, Counter-Defendants advertised to sell to Counter-Plaintiffs a license for a 'Licensed Concept' and certain other intellectual property (i.e. a 'franchise' as defined in the FTC Franchise Rule), without the intent to sell the franchise as such, but rather to attempt to unfairly and deceptively pass off the franchise as a licensing scheme, in order to subvert and evade the FTC Franchise Rule, in violation of 15 U.S.C. Section 5 (T.C.A. § 47-18-104(b)(9)); and

14

69. In the License Agreement between Counter-Defendants and Counter-Plaintiffs, Counter-Defendants represented that a consumer transaction, the 'License Agreement' (along with the Asset Purchase Agreement, Bill of Sale, and other ancillary contracts and documents), confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law, including but not limited to, all of those pertaining to a license agreement, as distinct from a franchise, for, while all franchises include one or more trademark licenses, but not every trade mark license rises to the level of being a franchise, the relationship between Counter-Defendants and Counter-Plaintiffs was that of franchisor-franchisee. (T.C.A. § 47-18-104(b)(12));

70. Counter-Plaintiffs have suffered damages as a result of the unfair and deceptive acts of the Counter-Defendants;

(Doc. No. 15, at 18-20).

Notwithstanding these lengthy allegations, Defendants discuss only one specific allegation in arguing their TCPA claim survives summary judgment.[9] Defendants argue Plaintiffs violated the TCPA by violating the Federal Trade Commission's ("FTC") Franchise Rule, 16 C.F.R. § 436.2. Plaintiffs violated the Franchise Rule, Defendants argue, by representing in the License Agreements that the parties' relationship was *not* that of a franchisor/franchisee, and by failing to make the disclosures required of a franchisor. In that regard, the Franchise Rule requires a franchisor to provide a prospective franchisee with a detailed disclosure statement in connection with the offer or sale of a franchise. 16 C.F.R. §§ 436.2, 436.5. The FTC is authorized to bring suit to enforce the Rule. 15 U.S.C. §§ 45, 53; *United States v. Lasseter*, 2005 WL 1638735, at *1 (M.D. Tenn. June 30, 2005) (action brought by the FTC based on its statutory authority to enforce the Franchise Rule). There is no private right of action available, however, for franchisees to enforce the Rule. *See, e.g., Akers v. Bonifasi,* 629 F. Supp. 1212, 1221-22 (M.D. Tenn. 1984); *A Love of*

---

[9] To the extent the Defendants make passing reference to other allegations, they have failed to support the allegations with evidence sufficient to defeat summary judgment. *Celotex Corp.,* 475 U.S. at 324; *Anderson,* 477 U.S. at 251-52. Thus, those allegations are dismissed.

*Food I, LLC v. Maoz Vegetarian USA, Inc.,* 70 F.Supp.3d 376, 382 (D.D.C. 2014).

Defendants contend the Franchise Rule is enforceable under the TCPA because violation of the Rule is an "unfair or deceptive" act or practice for purposes of the FTC Act, and the TCPA is to be interpreted consistently with the FTC Act. *See* 16 C.F.R. § 1.8 ("A violation of a rule shall constitute an unfair or deceptive act or practice in violation of section 5(a)(1) of that Act, unless the Commission otherwise expressly provides in its rule."); Tenn. Code Ann. § 47-18-115 ("It is the intent of the general assembly that this part shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)).[10] Defendants have not cited any authority, however, holding that failure to strictly comply with the Franchise Rule is a *per se* unfair and deceptive act or practice under the TCPA. *Cf. Cluck-U Chicken, Inc. v. Cluck-U Corp.,* 358 F.Supp.3d 1295, 1313 (M.D. Fla. 2017) ("Liability under [the Florida Deceptive and Unfair Trade Practices Act] requires more than a mere technical violation of the FTC's Franchise Rule;" party must also prove the alleged violation "was likely to deceive a consumer acting reasonably in the same circumstances.")

Plaintiffs argue that the relationship created by the License Agreements was not that of franchisor/franchisee, but even if it were, and even if the Franchise Rule were enforceable under the TCPA, the statute of limitations bars Defendants' counterclaim. Actions by private parties to enforce the TCPA "shall be brought within one (1) year from a person's discovery of the unlawful act or practice . . ." Tenn. Code Ann. § 47-18-110. Under this "discovery rule," a TCPA cause of

---

[10] A number of states have enacted their own franchise disclosure laws, but Tennessee has not. *A Love of Food,* 70 F.Supp.3d at 382-83; *cf.* Tenn. Code Ann. §§ 47-25-1501, *et seq.* (governing *termination* of franchise relationships).

action accrues, and the statute of limitations begins to run, "'when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant.'" *Montesi v. Nationwide Mut. Ins. Co.,* 970 F.Supp.2d 784, 789 (W.D. Tenn. 2013) (quoting *Almanza v. Baird Tree Serv. Co.,* 2012 WL 4758276, at *7 (E.D. Tenn. Oct. 5, 2012)). Although the determination of the time when a plaintiff discovers or reasonably should have discovered a cause of action is typically a question of fact, accrual can be a question of law for the court when undisputed evidence can lead to only one conclusion. *Id.* at 789-90.

Defendants' TCPA claim, as discussed above, is that Plaintiffs represented the parties' relationship was *not* that of a franchisor/franchisee, and consequently, Plaintiffs failed to make the disclosures required of a franchisor in offering to sell a franchise. According to Defendants, one need look no further than the terms of the agreements themselves to conclude the arrangement was actually a franchise. Defendants do not rely on any specific events occurring *after* the agreements were executed to support their claim. Plaintiffs argue the cause of action accrued, therefore, when the agreements were executed. Defendants have not addressed the statute of limitations argument in their briefs, nor have they otherwise suggested a different accrual date.

Based on the record presented, the Court concludes Defendants knew, or in the exercise of reasonable care and diligence should have known, the basis of their cause of action on the day Ms. Covington signed the agreements. According to Defendants, the agreements described the true nature of the relationship, and any disclosures should have been made on or before the day the agreements were executed. The BCR Savannah License Agreement was executed on November 12, 2015, and the BCR Augusta License Agreement was executed on June 9, 2017. (Doc. No. 13-2, at 1, 26). The TCPA counterclaim was filed on September 6, 2018 (Doc. No. 15), more than a

year after the agreements were signed. Accordingly, Defendants' TCPA counterclaim is barred by the statute of limitations.[11]

## E. Fraud-Related Counterclaims

Defendants have asserted counterclaims for fraudulent misrepresentation (or alternatively, negligent misrepresentation), fraudulent concealment, constructive fraud, and fraud in the inducement to contract. Plaintiffs argue they are entitled to summary judgment on these counterclaims because Defendants have failed to support them with sufficient evidence to withstand summary judgment.

The Tennessee courts consider "fraud," "intentional misrepresentation," and "fraudulent misrepresentation" to be different names for the same cause of action. *Hodge v. Craig,* 382 S.W.3d 325, 342 (Tenn. 2012). "To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on

---

[11]   Plaintiffs alternatively argue the TCPA counterclaim should be dismissed because Defendants have failed to present evidence as to the damages/causation element of the claim. *See, e.g., A Love of Food,* 70 F.Supp.3d at 412 (explaining that even in states with their own franchise disclosure laws, the plaintiff must show the lack of disclosure was the cause of its damages in order to recover on a failure to disclose claim). Plaintiffs also argue the Franchise Rule did not require disclosures in this case because Ms. Covington was an "insider," and fell within an exception to the Rule. *See* 16 C.F.R. § 436.8(a)(6) (disclosures need not be made to certain purchasers who worked in management at the franchisor for two years within 60 days of the sale). Given the Court's dismissal of the TCPA counterclaim on other grounds, it is unnecessary to address these arguments.

the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation." *Id.*, at 343. *See also Thompson v. Bank of America, N.A.,* 773 F.3d 741, 751 (6th Cir. 2014).

Defendants allege Plaintiffs engaged in fraudulent misrepresentation by representing the agreements between the parties were license agreements when they knew the agreements were, in fact, franchise agreements. (Doc. No. 15 ¶¶ 11-36). The motivation for the alleged misrepresentation, according to the counterclaim, was the desire to avoid application of the FTC Franchise Rule. (*Id.*) The misrepresentation is allegedly reflected in Section 18.1 of the agreement, which, as discussed above, states: "BCR and Licensee are not and may not be considered as franchisor/franchisee, joint venture, partners, or agents of each other . . . Licensee specifically acknowledges that the relationship created by this Agreement is not a fiduciary or any other similar or special relationship, but solely an arm's-length business relationship." (Doc. No. 30-2, at 14).

To support their fraud claims, Defendants rely on the deposition testimony of Mr. Holloway that he spent "months and months and thousands and thousands of dollars consulting with my attorneys" to determine "exactly what I can and cannot do as a licensor" before engaging in licensing. (Doc. No. 47-1, at PageID # 600).[12] Defendants also rely on the testimony of Ms. Covington that: (1) Mr. Gardner told her Mr. Holloway "brought some people in to talk about franchising at one time, on pricing, to what it would cost to do the paperwork up for franchising. And it was an astronomical amount, and that's when he decided to do the paperwork himself;" (2) Mr. Holloway asked her, during a conversation at a bar when she was the general manager of

---

[12]   Defendants also point to statements made about Mr. Holloway by Mr. Gardner in the interview transcript. For the reasons explained above, Mr. Gardner's interview is not properly authenticated and presented for summary judgment consideration.

BCR's Savannah location, if she wanted to buy the location as a "franchise;" and (3) she "completely trusted Mr. Holloway with everything, as far as all the paperwork, everything that was being done." (Doc. No. 42-1, at PageID ## 508, 493, 497). Finally, Defendants rely on the contents of the License Agreements to establish the relationship described is actually that of a franchisor/franchisee, rather than licensor/licensee.

As to the first element of their fraud claim, the only "representation" Defendants discuss in the summary judgment briefs is the "not a franchisor/franchisee" language contained in Section 18.1 of the License Agreements. Plaintiffs argue the provision of a contract stating the parties are not in a franchise relationship is not a "representation of a present or past material fact" for purposes of a fraud claim. Plaintiffs contend the contract language constitutes a legal opinion, and Ms. Covington was free to have that opinion confirmed by her own legal counsel before she signed the agreements.

In *Boyce v. LPP Mortg. Ltd.*, 435 S.W.3d 758 (Tenn. Ct. App. 2013), the Tennessee Court of Appeals discussed the distinction between representations of fact and representations of law in the context of considering whether to apply equitable estoppel:

> [I]n order to apply equitable estoppel, the opposing party must have either concealed material facts or made a false representation of material 'facts, either past or present.' *Consumer Credit Union v. Hite,* 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990). Legal arguments, however, are not facts.
>
> * * *
>
> Indeed, the situation presented by this case is similar to the situation wherein a party makes a material factual misrepresentation in order to induce another party to make a contract. In that situation, Williston on Contracts notes that misstatements as to the law do not qualify as material factual misrepresentations:
>
> > It is well settled that a claim of fraud in the making of a contract cannot generally be supported by proof of misstatements as to matters of law. On this principle, a conscious misstatement of the meaning of certain terms in a written contract has been held immaterial.

20

> The rule, which is in essence an application of the broader principle that fraud must rest on a misrepresentation of a matter of fact, and cannot be supported by a misstatement of a matter of opinion, is based on the principle that everyone is equally capable of determining the law, is presumed to know the law and is bound to take notice of the law and, therefore, in legal contemplation, cannot be deceived by representations concerning the law or permitted to say he or she has been misled.

> 26 *Williston on Contracts* § 69:10 (4th ed.) (noting certain exceptions not applicable in this case).

435 S.W.3d at 772; *see also Downing v. Fidelity Nat'l Title Ins. Co.,* 2017 WL 6371196, at *7-8 (N.D. Ga. Sept. 14, 2017) (under Georgia law, "[a] claim of fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law."); *General Electric Capital Corp. v. Delaware Machinery & Tool Co.,* 2011 WL 1899203, at *3 (S.D. Ind. May 17, 2011) (dismissing fraudulent inducement claim where plaintiff alleged defendant misrepresented their contract as a lease rather than a security agreement; fraudulent inducement claim, under Indiana law, may not be based on representations as to the legal effect of the document sued on because "[e]very person is presumed to know the contents of the agreement which he signs, and has, therefore, no right to rely on the statements of the other party as to its legal effect.")

The reason for requiring the "representation" be one of fact and not law becomes clear, in this case, when one attempts to establish the veracity of the representation, *i.e.* does the License Agreement actually describe a franchise? Defendants claim the alleged representation is false because the terms of the License Agreements satisfy the definition of "franchise" fashioned by the FTC in its Franchise Rule:

> (h) Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

>> (1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or

distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h). But the term "franchise" is also defined in other statutes. For example, for purposes of its franchise termination statute, the Tennessee legislature defines the term as follows:

'Franchise' means a written or oral agreement for a definite or indefinite period, in which a person grants to another person authority to use a trade name, trademark, service mark or related characteristic within an exclusive territory, or to sell or distribute goods or services, within an exclusive territory, at wholesale, retail, by lease agreement or otherwise; provided, that 'franchise' means only such agreement where the franchisee is required to be licensed under § 57-3-203; and provided further, that a franchise is not created by a lease, license or concession granted by a retailer to sell goods or furnish services on or from premises which are occupied by the retailer-grantor primarily for its own merchandising activities;

Tenn. Code Ann. § 47-25-1502(1); *see also* Tenn. Code Ann. § 47-25-1902(6) (defining the term for the Motorcycle and Off-Road Vehicle Dealer Fairness Act); Tenn. Code Ann. § 47-25-602(5) (defining the term for the Petroleum Trade Practices Act).

In the Court's view, the determination of whether the terms of the License Agreements describe a "franchise" relationship is a legal opinion, dependent on the definition to be applied to the facts given. The resulting conclusion is not a "fact" that can be objectively verified. Nor have Defendants suggested that any government agency or association makes such a determination, through a "license," "certification," or otherwise. Thus, on the record before the Court, Defendants have failed to establish that Plaintiffs made a representation of fact for purposes of the first element

of their fraudulent misrepresentation counterclaim.[13] Accordingly, summary judgment is warranted on that claim.

Defendants alternatively allege Plaintiffs engaged in negligent misrepresentation. Negligent misrepresentation has been limited by Tennessee courts to "'business or professional persons who negligently supply false information for the guidance of others in their business transactions.'" *Hodge,* 382 S.W.3d at 345. To recover for negligent misrepresentation, the plaintiff must prove: (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; (2) the defendant supplies faulty information meant to guide others in their business transactions*;* (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information. *Robinson v. Omer,* 952 S.W.2d 423, 427 (Tenn. 1997). *See also Thompson,* 773 F.3d at 752.

For the reasons described with regard to fraudulent representation, Defendants cannot establish the second element of this claim – that Plaintiffs supplied "faulty information" by representing the relationship described in the agreements was a "franchise." The determination of whether that representation constitutes "faulty information" is a legal opinion, dependent on the definition to be applied to the facts given. Thus, summary judgment is warranted on this counterclaim.

---

[13]    Plaintiffs also argue Defendants cannot establish the fourth element of the claim – that Ms. Covington was justified in relying on the truth of the representation. As Plaintiffs point out, Ms. Covington had the means of acquiring her own legal opinion simply by having the agreements reviewed by legal counsel, and Defendants have not suggested she entered into the agreements through threats, force, or undue pressure. *See Boyce,* 435 S.W.3d at 772 (explaining that equitable estoppel requires the party raising the defense to show he lacked the opportunity to know the truth, and denying application of the defense because appellants, "through diligent research, had every opportunity to know of the [relevant legal] decisions.") Given the Court's dismissal of the fraud claims on other grounds, however, it is unnecessary to address this issue.

Although Defendants allege separate counterclaims for constructive fraud and fraudulent concealment, Tennessee courts have explained they are both parts of the same cause of action:

> Fiduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training, judgment or expertise, is in a superior position to advise or act on behalf of the party bestowing trust and confidence in him. Once the relationship exists 'there exists a duty to speak . . . [and] mere silence constitutes fraudulent concealment.'

*PNC Multifamily Capital Institutional Fund XXVI Ltd. Partnership v. Bluff City Community Development Corp.,* 387 S.W.3d 525, 549-50 (Tenn. Ct. App. 2012) (quoting *Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn. 1998)); *see also Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006) (holding constructive frauds concern "a breach of a legal or equitable duty, with or without fraudulent intent, and entail as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others.")

The courts recognize two types of concealment: one type is where there is a duty to disclose and the other type is where the concealment constitutes a trick or contrivance. *Id.*, at 550. A party commits fraudulent concealment when he or she fails to disclose "a known fact or condition where he or she had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *PNC,* 387 S.W.3d at 550. The fact or condition must be one that is "material." *Id.* A party does not have a duty to disclose a material fact, however, "where ordinary diligence would have revealed the undisclosed fact:"

> 'a party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted.'

*Id.,* at 550-51. The plaintiff must also show her damages were caused by her reasonable reliance

on the nondisclosure. *Id.,* at 551.

Assuming Defendants can establish Plaintiffs had a "duty to disclose" for purposes of these claims, they have failed to present evidence that "a known *fact or condition*" was not disclosed. As with the other fraud claims, Defendants allege liability here based on Plaintiffs' failure to disclose the relationship described in the agreements was a "franchise." As explained above, the conclusion that the relationship is a "franchise" is a legal opinion, dependent on the definition to be applied to the facts given. That conclusion is not a "fact or condition" that can be objectively verified. Therefore, summary judgment is warranted on Defendants' counterclaims for constructive fraud and fraudulent concealment.

In order to recover for fraud in the inducement to contract, a plaintiff must show the defendant: (1) made a false statement concerning a fact material to the transaction; (2) with knowledge of the statement's falsity or utter disregard for its truth; (3) with the intent of inducing reliance on the statement; (4) the plaintiff reasonably relied on the statement; and (5) the reliance resulted in an injury. *Thompson,* 773 F.3d at 752; *see also Baugh v. Novak,* 340 S.W.3d 372, 388 (Tenn. 2011).

To support this claim, Defendants rely on Ms. Covington's deposition testimony that, during a conversation with Mr. Holloway in a bar, which occurred when she was the general manager of BCR's Savannah location, Mr. Holloway asked her if she wanted to buy the location as a "franchise." (Doc. No. 42-1, at PageID # 493, 497). Defendants also base liability for this claim on the contents of the agreements.[14]

---

[14] Defendants also rely on the interview transcript of Mr. Gardner. For the reasons explained above, Mr. Gardner's interview is not appropriately presented for summary judgment consideration.

Again, Defendants have failed to present evidence that Plaintiffs made a false statement of fact. As for Mr. Holloway's use of the word "franchise" during his conversation with Ms. Covington, Defendants do not take the position that the reference was *false.* Indeed, Defendants argue the relationship *was* a franchise.[15] As for the statement in the agreements themselves, for the reasons described above, Defendants have not shown the statement is a "fact," as opposed to a legal opinion. Accordingly, summary judgment is warranted on Defendants' counterclaim for fraud in the inducement to contract.

## F. Tortious Interference with Business Relationships

In order to establish the tort of intentional (tortious) interference with business relationships under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of America, Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn. 2002).

Plaintiffs argue Defendants have not presented sufficient admissible evidence to withstand summary judgment on this counterclaim. In response, Defendants cite to the deposition testimony of Ms. Covington describing the basis for the claim:

---

[15] Plaintiffs also argue any reliance by Ms. Covington on such statements would be unreasonable. *See Solomon v. First American Nat'l Bank of Nashville,* 774 S.W.2d 935, 943-44 (Tenn. Ct. App. 1989) (explaining that a party dealing on equal terms with another generally is not justified in relying upon that person's representations regarding the contents of a writing when the means of knowledge is equally available to both parties). Given the Court's dismissal of this counterclaim on other grounds, it is unnecessary to address this issue.

A. I don't have the customers' names with me, as far as right off the top of my head. But I had two separate customers, one from Augusta, Georgia and one from Savannah, Georgia, that called in based on (sic) this was right at the time that everything took place, the separation between us took place, they called the 800 number and reached corporate. Corporate was told that any calls that came in from any of our branches were to go directly to Mr. Holloway. The homeowner called in, and Mr. Holloway told them that he owned Best Choice Roofing, that the paperwork that they had was fraudulent paperwork, that we were not in business, that we were a fraudulent company and not to do business with us.

Q. All right. Can you please, as a late-filed exhibit, provide me the names of those customers?

A. I can.

Q. Thank you.

(WHEREUPON, a document was marked as Late-Filed Exhibit Number 14.)

BY MR. COOK:

Q. Any others besides those two?

A. Those two are the only two that I'm aware of that reached out that my salesman was able to contact to find out why, they -- I don't know if there's any others or not, because I wasn't -- those were the only two that we actually spoke with.

Q. All right. And did they terminate your contract?

A. One did, one did not.

Q. All right.

A. One terminated it to start with because I was actually up here. But when I got back and was able to speak to them . . .

(Doc. No. 42-1, at PageID #495-96).

Plaintiffs argue Ms. Covington has yet to identify the two customers to whom she referred during her deposition, and that her testimony is not sufficient to establish the elements of the counterclaim. In response, Defendants argue they "need not reveal their fact witnesses to Counter-

Defendants unless required to do so by Rule or court order . . ." (Doc. No. 63, at 17), and that Ms. Covington's testimony is sufficient to withstand summary judgment.

It is not clear from Ms. Covington's testimony whether she spoke to the customers personally (rather than learning this information from her salesman), but if she did not, her testimony arguably would not be admissible at trial for lack of personal knowledge. Fed. R. Evid. 602. Assuming Ms. Covington spoke with these customers directly and they relayed to her Mr. Holloway's statements, Plaintiffs argue her testimony would be inadmissible at trial under the applicable hearsay rules. Defendants contend her testimony is not hearsay because it is not offered for the truth, and is admissible under Federal Rule of Evidence 801(d)(2) as the statement of a party opponent.

The Court agrees that Mr. Holloway's alleged statement to the customers about the defemdant companies would likely be admissible at trial under Federal Rule of Evidence 801, as Defendants argue, if the *customers* were called to testify about the statement. The customers' statements to Ms. Covington, however, is a different matter; and Defendants have not addressed the admissibility of *Ms. Covington's* testimony about those statements. *See, e.g., Back v. Nestle USA, Inc.,* 694 F.3d 571, 577-78 (6th Cir. 2012) ("For double-hearsay statements to be admissible, each separate statement must either be excluded from the hearsay definition or fall within a hearsay exception."); Fed. R. Evid. 805. The statements were made to Ms. Covington by the customers – not a party opponent; and they would be offered for the truth – to prove Mr. Holloway made the disparaging statement to the customers. *See Warren v. Fed. Nat'l Mtg. Assoc.,* 932 F.3d 378, 387-88 (5th Cir. 2019) (first level of hearsay may not be offered for truth but second level of hearsay is offered to prove truth of what witness heard); *EEOC v. Evans Fruit Co., Inc.,* 2013 WL 4498747 (E.D. Wash. Aug. 21, 2013) (same); *United States v. Dickey,* 102 F.3d 157, 163 (5th Cir. 1996)

(same). Defendants have failed to explain the admissible form in which this evidence could be presented at trial, and therefore, the Court must disregard the deposition testimony of Ms. Covington. As Defendants have presented no other evidence in support of their tortious interference with business relationships counterclaim, summary judgment is warranted.

## G.  Defamation

In order to establish a claim for defamation under Tennessee law, a plaintiff must show: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Brown v. Christian Bros. Univ.,* 428 S.W.3d 38, 50, (Tenn. Ct. App. 2013).

Plaintiffs argue Defendants have failed to present evidence sufficient to withstand summary judgment on the defamation counterclaim. To support this claim, Defendants offer the same deposition testimony of Ms. Covington offered in support of the tortious interference with business relationships counterclaim. As with that claim, they do not explain how that testimony could be presented in admissible form at trial. As Defendants have cited no other evidence in the record to support their defamation counterclaim, summary judgment is warranted.

## H.  Unjust Enrichment

To recover on an unjust enrichment claim under Tennessee law, the plaintiff must show: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).  "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* "A

plaintiff need not be in privity with a defendant to recover," but must demonstrate "that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract." *Id.* A plaintiff need not show the defendant received a direct benefit in order to recover; "a plaintiff may recover for unjust enrichment against a defendant who receives any benefit from the plaintiff if the defendant's retention of the benefit would be unjust." *Id.*

Plaintiffs argue Defendants have failed to present evidence sufficient to withstand summary judgment on the unjust enrichment counterclaim. The factual allegations pled by Defendants in connection with this claim to relate to Plaintiffs' receipt of rebates from suppliers that Defendants claim should have been paid to them as the "procuring cause." (Doc. No. 15, at 22-23). Defendants have not addressed this claim in any of their summary judgment briefs, nor have they otherwise cited to evidence in the record to support the claim. Therefore, summary judgment is warranted on the unjust enrichment counterclaim.

### IV. Conclusion

For the reasons set forth above, Defendants' counterclaim for breach of the notice and cure provisions of the License Agreements may proceed to trial. In all other respects, Plaintiffs' summary judgment motion is granted, and Defendants' summary judgment motion is denied.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE